**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ___17-80194-CR-MIDDLEBROOKS/BRANNON___

**UNITED STATES OF AMERICA**

vs.

**ALAN MARTIN BOSTOM,**

**Defendant.**
_____/

## FACTUAL PROFFER

Defendant Alan Martin Bostom (hereinafter "the defendant" or "Bostom"), his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and are sufficient to support a plea of guilty:

1.     The defendant and his co-defendant, Tovah Lynn Jasperson, a/k/a "Tara" ("Jasperson"), were residents of Wellington, Florida, in Palm Beach County, in the Southern District of Florida.  The co-defendants share a familial relationship, that is, the defendant is Jasperson's father.

2.     In July 2010, the defendant filed and caused the filing of documents with the Florida Secretary of State to create "Angels and Angelmen, LLC." In August 2010, the name of the limited liability company was changed from "Angels and Angelmen, LLC" to "Angel's House LLC," d/b/a "Angel's Recovery" (hereinafter referred to as "Angel's Recovery").

3.     Jasperson later filed and caused the filing of documents with the Florida Secretary of State listing herself as the 100% owner of Angel's Recovery.  Despite the representation to the Secretary of State regarding the change in ownership, Bostom continued to be involved in the management of Angel's Recovery and continued to participate in its profits.

4.     Jasperson and Bostom also filed and caused the filing of documents with the Florida Secretary of State to create a separate LLC named "Angel's Recovery, LLC." On June 3, 2014, Jasperson, on behalf of Angel's Recovery, LLC, filed and caused the filing of a fictitious name registration with the Florida Secretary of State, providing notice that Angel's Recovery, LLC, owned the fictitious name "Gold River Labs." The filing gave Angel's Recovery, LLC ownership of the name "Gold River Labs" through December 31, 2019.

5.     Angel's Recovery had multiple locations in Palm Beach County, in the Southern District of Florida, including 11576 Pierson Road, Wellington, Florida, and 222 Professional Way, Wellington, Florida. Angel's Recovery purported to operate as a licensed "substance abuse service

provider" or "treatment center," that is, it offered clinical treatment services for persons suffering from alcohol and drug addiction. Angel's Recovery offered medication-based treatment for opioid addiction, that is, treatment on a "nonresidential basis which utilize[d] methadone or other approved medication in combination with clinical services to treat persons who are dependent upon opioid drugs." Fla. Admin. Code § 65D-30.002(16)(m).

6.      At different times, Jasperson and Bostom managed all aspects of Angel's Recovery, including hiring and firing personnel, admitting and discharging patients, and making financial decisions. Jasperson and Bostom were listed as owners and Chief Executive Officers of Angel's Recovery on the licensing documents filed with the Department of Children and Families ("DCF").

7.      To be properly licensed by the State of Florida, Angel's Recovery was required to have a "medical director," that is, "a physician licensed under Chapter 458 or 459, [Florida Statutes], who has been designated to oversee all medical services of a [substance abuse treatment] provider and has been given the authority and responsibility for medical care delivered by a provider. Fla. Admin. Code § 65D-30.002(37).

8.      Jasperson and Bostom hired a person with initials KRK (hereinafter referred to as "Doctor #1") to serve as the medical director of Angel's Recovery. Doctor #1 had two reported reprimands from the Florida Board of Medicine, was the subject of a third disciplinary proceeding, and was actively abusing prescription opioids and cocaine.

9.      During the period of his employment, Doctor #1 frequently pre-signed prescriptions that were used to dispense controlled substances to patients of Angel's Recovery by other employees.

10.      After several years of contested proceedings, on February 17, 2015, the Florida Board of Medicine issued a Final Order suspending Doctor #1's medical license for four years. Following the suspension, Jasperson and Bostom continued to employ Doctor #1 as the medical director of Angel's Recovery, knowing that Doctor #1's license had been suspended. After his license was suspended, and until at least September 2, 2015, Doctor #1 continued to examine and treat some patients at Angel's Recovery, continued to prescribe controlled substances and bodily fluid testing to Angel's Recovery patients, and continued to provide pre-signed prescriptions that allowed other employees of Angel's Recovery to unlawfully provide prescriptions for controlled substances and bodily fluid testing to Angel's Recovery patients. The bodily fluid testing that was prescribed by Doctor #1 (or others using prescriptions pre-signed by Doctor #1) was not properly prescribed or medically necessary because: (i) Doctor #1 signed the prescriptions and statements of medical necessity for bodily fluid testing when he had not examined the patients prior to prescribing the testing; (ii) Doctor #1 was not a licensed medical doctor at the time he signed the prescriptions and statements of medical necessity; and (iii) the test results were not timely reviewed or used by a doctor or treatment professional in developing or modifying the patients' treatment plans. The suspension of Doctor #1's license was a material fact in connection with the delivery of health care services, particularly in connection with maintaining a valid license from the Department of Children and Families, and the defendant concealed that fact from the Department of Children and Families.

11.      Substance abuse treatment facilities in Florida that offer inpatient treatment or offer

outpatient treatment with a residential housing component are subject to specialized licensing requirements. Many insurance companies do not provide coverage for inpatient treatment (other than inpatient detoxification) or for residential housing components, so patients are required to pay for their own housing while attending outpatient treatment.

12.     To secure a steady stream of patients, Jasperson and Bostom established illegal kickback/bribe relationships with owners of recovery residences, commonly referred to as "sober homes," in exchange for referring the sober homes' insured residents to Angel's Recovery for treatment. Jasperson and Bostom provided the money used to purchase or rent several properties used as "sober homes," although the purchase agreements or leases would bear the names of third parties.

13.     Redemption Sober House, Inc. ("Redemption") was a multi-bed residence in Palm Beach County, Florida, located at 243 N.E. 13th Street, Delray Beach, Florida, that purported to operate as a sober home. According to corporate records filed with the State of Florida, Michael Bonds was the president of Redemption. Michael Bonds referred Redemption residents to Angel's Recovery and, in exchange, directly or indirectly received more than $700,000 in payments from Angel's Recovery.

14.     A person with initials A.J. owned two multi-bed residences in Palm Beach County, Florida, that purported to operate as sober homes. A.T. Way LLC ("A.T. Way") was located at 120 SW 13th Ave, Boynton Beach, Florida, and Carter Care Recovery ("Carter Care") was located at 315 SW 7th Avenue, Boynton Beach, Florida. A.J. received money from the defendants to purchase the properties used as A.T. Way and Carter Care. A.J. referred residents of A.T. Way and Carter Care to Angel's Recovery and, in exchange, directly or indirectly received more than $150,000 in payments from Angel's Recovery.

15.     The defendants and their co-conspirators required the sober home residents to travel to Angel's Recovery multiple times per week to attend treatment sessions and to submit to drug testing, which the defendants and co-conspirators could bill to the Insurance Plans. To this end, the defendants sent vans to the sober homes to transport the residents to Angel's Recovery.

16.     The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve the provision of treatment and related services to individuals with respect to substance abuse and with protecting the legal rights of individuals who are substance abusers. 42 U.S.C. § 290aa.

17.     "Substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C. § 290cc-34(4). "Treatment" meant "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

18.     In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes. Sober homes generally did not provide medical care or clinical services to their residents. When properly managed, sober homes operated as alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs, including

providing a peer support network of individuals in recovery.

19.     Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Amongst other things, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a). Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fl. Stat. § 397.431

20.     DCF was tasked with regulating and licensing substance abuse service providers. Fl. Stat. § 397.321.

21.     The Marchman Act also provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment." Fl. Stat. § 397.311(36).

22.     Insurance coverage for substance abuse treatment and testing was available through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP"), health plans sponsored by private employers (including the National Railroad Passenger Corporation ("Amtrak") employee health care benefit plans), and health plans offered directly by private insurance companies. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

23.     Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield ("BCBS"), Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

24.     Angel's Recovery submitted claims for reimbursement to multiple health benefit plans, including the FEHBP plans, Amtrak's established plans, and private ERISA and non-ERISA health benefit plans (jointly referred to as "the Insurance Plans").

25.     The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

26.     Regardless of the type of Insurance Plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

27.     The "Florida Patient Brokering Act," made it a felony offense for any person, health care provider, or health care facility, including any state licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in

4

cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

28.    The defendants and co-conspirators provided kickbacks and bribes, in the form of free or reduced rent, insurance premium payments, and other benefits to individuals with insurance who agreed to reside at the sober homes and attend drug treatment, which included regular and random drug testing (typically three or more times per week), so that members of the conspiracy could bill the testing and treatment to the residents' Insurance Plans. To disguise kickbacks and bribes to patients, the defendants used a separate entity named Angel Watch Foundation, Inc., to pay insurance premiums for patients of Angel's Recovery so that Angel's Recovery could continue to bill the patients' insurance companies for treatment expenses.

29.    Under the terms of the insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were "medically necessary" and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

30.    Unlike treatment facilities, sober homes generally did not provide medical care or clinical services that could be reimbursed by health insurance. While there were federal and state guidelines, sober homes were not licensed or funded by state or local governments. However, if a treatment facility offered residential services, those services had to be licensed by DCF. Since sober homes were merely places to live, legitimate sober homes generated income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

31.    Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

32.    Like other medical tests, bodily fluid testing could be billed and reimbursed pursuant to the terms of the insurance policy. The Insurance Plans were only responsible for claims for testing that was "medically necessary," actually performed, properly prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

33.     The defendants and co-conspirators prepared and caused the preparation and submission of fraudulent insurance claim forms attesting that the billed amounts qualified for reimbursement, that is, (i) the claims falsely stated that the testing and treatment had been medically necessary when, in truth and in fact, some of the claimed testing and treatment had not been necessary; (ii) the claims failed to disclose that the patients were referred to Angel's Recovery in exchange for kickbacks and bribes; (iii) the claims failed to disclose that some patients had not paid their co-payments and deductibles; (iv) the claims failed to disclose that some of the patients' insurance premiums were paid by the defendants themselves; and (v) the claims failed to disclose that Doctor #1's medical license was suspended and, accordingly, the license of Angel's Recovery was invalid because it did not have a properly licensed medical director.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 1/12/18                    By: _____
                                 A. MARIE VILLAFAÑA
                                 ASSISTANT UNITED STATES ATTORNEY

Date: 1/12/18                    By: _____
                                 ROBERT M. NICHOLSON, ESQ.
                                 ATTORNEY FOR DEFENDANT

Date: 1/12/18                    By: _____
                                 ALAN MARTIN BOSTOM, DEFENDANT

6